UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -  x
                                                               :
 UNITED STATES OF AMERICA
                                                               :
            - v. -
                                                               :      14 Cr. 632 (JMF)
 MICHAEL A. LUCARELLI,
                                                               :
            Defendant.
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -  x


**SENTENCING MEMORANDUM OF THE UNITED STATES OF AMERICA**


                                    PREET BHARARA
                                    United States Attorney for the
                                           Southern District of New York,
                                    Attorney for the United States
                                           of America


Brian R. Blais
Damian Williams
Assistant United States Attorneys

        - Of Counsel -

## PRELIMINARY STATEMENT

The Government respectfully submits this memorandum in connection with the sentencing of defendant Michael A. Lucarelli ("Lucarelli"), which is scheduled for January 8, 2015, at 3:30 p.m.   For the reasons that follow, the Government agrees with the Probation Office that a sentence within the range of 37 to 46 months' imprisonment, calculated pursuant to the United States Sentencing Guidelines (the "Guidelines or "U.S.S.G."), is appropriate.

Lucarelli, in flagrant abuse of the trust placed in him by his employer and the clients of his employer, engaged in a pattern of insider trading spanning more than a year that generated profits to him of nearly $1 million.   On more than two dozen occasions, Lucarelli profited handsomely by trading in the stocks (and related options) of clients of his employer, Lippert Heilshorn & Associates, Inc. ("LHA"), an investor relations firm, before the announcement of significant news by these clients.   Lucarelli's *modus operandi* was deceivingly simple – he accessed draft press releases of LHA clients maintained on a firm shared drive in advance of the issuance of these press releases – but pointedly effective.   Armed in advance of the market with news of quarterly financial results, upcoming acquisitions and other significant corporate events, Lucarelli used his informational edge to generate hundreds of thousands of dollars of trading profits.

Lucarelli's conduct was brazen, and the goals of sentencing – particularly just punishment, promotion of respect for the law, and adequate deterrence – warrant a term of imprisonment within the Guidelines range.   Lucarelli's proffered explanation for his conduct, that his trading was the product of a drug-fueled, retaliatory frolic, cannot excuse and does not mitigate Lucarelli's frequent and persistent transgressions of the law.   In view of the sustained character of his fraud and the calculated, repeated abuses of trust it involved, Lucarelli's conduct warrants a Guidelines sentence.

## FACTUAL BACKGROUND[1]

On September 29, 2014, Lucarelli entered a plea of guilty to a one-count Information

charging him with securities fraud.   The Information detailed thirteen distinct instances of insider

trading by Lucarelli during the time period August 2, 2013 through August 4, 2014.   These

thirteen instances of insider trading generated profits to Lucarelli of $538,215.32.   In his plea

agreement, Lucarelli acknowledged that another 18 trades during that same time period – trades

which generated profits to Lucarelli of $417,306.54 – were properly considered as "relevant

conduct" to the crime of conviction.   In total, Lucarelli's insider trading generated profits to him

of at least $955,521.62 during the course of his insider trading scheme.

From September 4, 2012 until the date of his arrest, Lucarelli was engaged as a consultant

by LHA[2] and served as LHA's Director of Market Intelligence in LHA's New York, New York

office.   In that role, Lucarelli was partly responsible for LHA's business development efforts,

including the identification and recruitment of new clients that could benefit from LHA's services.

At the time he was initially engaged as an LHA consultant, Lucarelli was provided with a copy of

LHA's internal policies, including its Code of Conduct, which prohibited trading in the securities

of any LHA clients.   In an email sent to LHA before he began work as a consultant, Lucarelli

stated his intention to abide by all LHA policies.

As an LHA consultant, Lucarelli had access to a shared network server, on which LHA

stored certain client-related documents, including draft and final versions of press releases that

---

[1] The information provided in the factual background discussed herein is derived from paragraphs 7-25 of the Presentence Investigation Report ("PSR") and the Complaint in this matter.

[2] LHA provides investor relations services to publicly-traded and private companies.   Among the services provided by LHA to its clients is the preparation of press releases announcing significant corporate events of LHA's clients, such as earning releases, proposed merger transactions and other newsworthy information.   In connection with its business, LHA is often in possession of material, non-public information regarding its clients.

LHA was preparing on behalf of its clients.   Lucarelli's job responsibilities as LHA's Director of

Market Intelligence did not include the drafting of press releases for LHA's clients, and Lucarelli

had no need to access draft press releases in order to complete his job responsibilities.

Lucarelli's illegal insider trading generally followed a straightforward pattern – Lucarelli

accessed press releases of LHA clients maintained on LHA's shared network server; Lucarelli then

opened a trading position in the shares (or related options) of these LHA clients based on his

assessment of whether the announcement would be viewed favorably or unfavorably by the

investing community and the market[3]; Lucarelli then exited the position shortly after the news was

released to the market through the press release that Lucarelli had accessed in advance of his

trading.   Three illustrative examples of Lucarelli's criminal conduct are as follows:

- On several occasions between July 31, 2013 and August 2, 2013, Lucarelli accessed shared drive folders containing press releases and other information regarding a company called TREX Company, Inc. ("TREX").   On August 2, 2013, in several trades, Lucarelli sold short 2,400 shares of TREX stock.   On August 6, 2013, TREX issued a press release announcing its financial results for the second fiscal quarter of 2013 and issuing third quarter revenue guidance that was below consensus estimates of research analysts.   On the same day the press release was issued, Lucarelli fully covered his TREX short position, realizing a profit of approximately $15,000.

- On several occasions between October 21, 2013 and November 12, 2013, Lucarelli accessed shared drive folders containing press releases and other information regarding a company called FAB Universal Corp. ("FAB").   On November 12, 2013, in several trades, Lucarelli purchased 27,000 shares of FAB.   On November 13, 2013, FAB issued a press release announcing its financial results for the third fiscal quarter of 2013, as well as an increase in its revenue and net income guidance for the full fiscal year.   On the same day the press release was issued, Lucarelli sold all 27,000 FAB shares, realizing a profit of approximately $20,000.

---

[3]  For example, if Lucarelli believed the market would react favorably to the news in the press release, he would buy shares of the client stock (i.e., take a long position) on the expectation that the price of the shares would rise following the release of the news; conversely, if Lucarelli believed the market would react unfavorably to the news in the press release, he would sell short shares of the client stock (i.e., take a short position) on the expectation that the price of the shares would decline following the release of the news.

- On several occasions between January 13, 2014 and February 13, 2014, Lucarelli accessed shared drive folders containing press releases and other information regarding a company called LCA-Vision Inc. ("LCAV").   On February 13, 2014, in several trades, Lucarelli purchased 44,921 shares of LCAV.   After the close of the market on February 13, 2014, LCAV issued a press release announcing an agreement with PhotoMedex, Inc. ("PhotoMedex") pursuant to which PhotoMedex agreed to acquire LCAV for cash consideration of $5.37 per share.   Between February 14, 2014 and February 19, 2014, Lucarelli sold all 44,921 shares of LCAV, realizing a profit of approximately $57,500.

The dozens of other instances of Lucarelli's insider trading generally followed a similar pattern.

Lucarelli's insider trading was conducted in four brokerage accounts associated with three different brokerage firms.   During the course of Lucarelli's insider trading scheme, trading was suspended in certain of Lucarelli's brokerage accounts by the brokerage firms at which these accounts were housed, after which Lucarelli simply opened new accounts at different brokerage firms to continue his insider trading scheme.   For example, Lucarelli opened two brokerage accounts at a particular brokerage firm ("Brokerage Firm-A") in 2008 and November 2013, respectively.   Trading in both of these accounts was suspended by Brokerage Firm-A on March 21, 2014.   Just three days after this suspension, Lucarelli opened a brokerage account at a different brokerage firm ("Brokerage Firm-B").   Brokerage Firm-B suspended trading in Lucarelli's account on June 3, 2014.   Just two days later, Lucarelli opened a brokerage account at yet a third brokerage firm ("Brokerage Firm-C").   Lucarelli was trading in this brokerage account until the time he was arrested in August 2014.

## APPLICABLE LAW

The advisory Sentencing Guidelines promote the "basic aim" of Congress in enacting the Sentencing Reform Act, namely, "ensuring similar sentences for those who have committed similar crimes in similar ways."   *United States* v. *Booker*, 543 U.S. 220, 252 (2005).   Thus, the

Guidelines are more than "a body of casual advice, to be consulted or overlooked at the whim of a sentencing judge."   *United States* v. *Crosby*, 397 F.3d 103, 113 (2d Cir. 2005).   The applicable Sentencing Guidelines range "will be a benchmark or a point of reference or departure" when considering a particular sentence to impose.   *United States* v. *Rubenstein*, 403 F.3d 93, 98-99 (2d Cir. 2005).   In furtherance of that goal, a sentencing court is required to "consider the Guidelines 'sentencing range established for . . . the applicable category of offense committed by the applicable category of defendant,' the pertinent Sentencing Commission policy statements, the need to avoid unwarranted sentencing disparities, and the need to provide restitution to victims." *Booker*, 543 U.S. at 259-60 (citations omitted).

Along with the Guidelines, the other factors set forth in Section 3553(a) must be considered.   Section 3553(a) directs the Court to impose a sentence "sufficient, but not greater than necessary" to comply with the purposes set forth in paragraph two.   That sub-paragraph sets forth the purposes as:

> (A) to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense;
>
> (B) to afford adequate deterrence to criminal conduct;
>
> (C) to protect the public from further crimes of the defendant; and
>
> (D) to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner. . . .

Section 3553(a) further directs the Court – in determining the particular sentence to impose – to consider: (1) the nature and circumstances of the offense and the history and characteristics of the defendant; (2) the statutory purposes noted above; (3) the kinds of sentences available; (4) the kinds of sentence and the sentencing range as set forth in the Sentencing Guidelines; (5) the

Sentencing Guidelines policy statements; (6) the need to avoid unwarranted sentencing disparities; and (7) the need to provide restitution to any victims of the offense.   *See* 18 U.S.C. § 3553(a).

The Second Circuit has instructed that district courts should engage in a three-step sentencing procedure.   *See Crosby*, 397 F.3d at 103.   First, the Court must determine the applicable Sentencing Guidelines range, and in so doing, "the sentencing judge will be entitled to find all of the facts that the Guidelines make relevant to the determination of a Guidelines sentence and all of the facts relevant to the determination of a non-Guidelines sentence."   *Id*. at 112. Second, the Court must consider whether a departure from that Guidelines range is appropriate. *Id*.   Third, the Court must consider the Guidelines range, "along with all of the factors listed in section 3553(a)," and determine the sentence to impose, whether it be a Guidelines or non-Guidelines sentence.   *Id.* at 113.   In so doing, it is entirely proper for a judge to take into consideration his or her "own sense of what is a fair and just sentence under all the circumstances." *United States* v. *Jones*, 460 F.3d 191, 195 (2d Cir. 2006).

## DISCUSSION

In light of the factors set forth in Title 18, United States Code, Section 3553(a), a sentence within the applicable Guidelines range of 37 to 46 months' imprisonment is "sufficient but not greater than necessary" to serve the goals of sentencing in this case.

### A.   Application of the Sentencing Guidelines

The parties and the Probation Office agree that the Guidelines range for imprisonment in this case is between 37 and 46 months.   The base offense level for insider trading is eight, and the applicable loss adjustment here is 14 levels because Lucarelli's gain was more than $400,000, but less than $1 million.   *See* U.S.S.G. §§ 2B1.4(a), 2B1.4(b) & 2B1.1(b)(1)(H); PSR ¶¶ 30-31. Added to the resulting 22 levels are two levels because Lucarelli abused a position of trust.   *See*

U.S.S.G. § 3B1.3; PSR ¶ 33.   Applying the three-level deduction for acceptance of responsibility,

the total offense level is 21.   *See* U.S.S.G. § 3E1.1(b); PSR ¶¶ 37-39.   Lucarelli has one prior

conviction for grand theft of personal property, which does not result in any criminal history points

because it occurred too far in the past.   *See* PSR ¶¶ 42-44.   Lucarelli is therefore in Criminal

History Category I.

### B.   The Section 3553(a) Factors

The seriousness of Lucarelli's offense is manifest.   Insider trading constitutes a violation

of the Securities Exchange Act of 1934.   A fundamental purpose of that statute is to ensure fair

dealing and to outlaw deceptive and inequitable practices in the securities markets.   The integrity

of the capital markets is critical to the functioning of the nation's economy, which depends upon

well-functioning markets for liquidity and access to capital.   Congress recognized that any

deceptive or manipulative practice that influenced or related to trading activity undermined the

function and purpose of a free market.   Insider trading causes that harm – namely, by undermining

the public's confidence in the capital markets, and by suggesting to ordinary investors that they

should not invest because those markets are rigged in favor of market insiders like Lucarelli.   Not

only did Lucarelli's crimes harm the integrity of the markets, they harmed his employer and the

clients of his employer, whose business secrets Lucarelli stole for his own benefit.   For these

reasons, when financial professionals like Lucarelli repeatedly and brazenly flout the law, they

must be punished accordingly.

Indeed, the insider trading conduct here was particularly egregious.   It occurred in

multiple securities of nearly a dozen companies on over thirty occasions over the course of a year.

Lucarelli's trading was frequent, pervasive and highly profitable.   Lucarelli's trading was in

blatant disregard of the fiduciary duties he owed to his employer and to the clients of his employer.

Lucarelli's trading behavior was also persistent – even after his trading had been suspended by certain brokerage firms, Lucarelli continued his pattern of illegal trading by simply opening new accounts at different brokerage firms.   Lucarelli's conduct was purposeful, knowing and sophisticated.   The nature and circumstances of Lucarelli's offense therefore warrant substantial punishment.

In his sentencing submission, Lucarelli acknowledges his participation in the charged conduct, but advances several arguments in purported mitigation of his conduct.   Specifically, Lucarelli argues that his insider trading was fueled by a desire to retaliate against LHA for its perceived failure to live up to promises allegedly made to him; that his insider trading was the product of years of drug abuse driven in part by a painful medical condition; and that he has already been adequately punished because he has forfeited the proceeds of his illegal activity.   *See* Lucarelli Sentencing Submission ("Lucarelli Sub.") at 1-5.   None of these arguments establish that a variance from the Guidelines range is warranted.

First, Lucarelli argues that his conduct was the product of a misguided scheme to retaliate against his employer for an alleged failure to pay promised commissions.   *See* Lucarelli Sub. at 1. This purported motivation for Lucarelli's conduct does not excuse or mitigate his conduct; Lucarelli is no less culpable for his insider trading because he, at the same time, believed he was being shortchanged by LHA.   In any event, Lucarelli's alleged motivation rings hollow given that he was paid a substantial salary – over $100,000 per year – during his time at LHA.   Nor is it at all evident how Lucarelli's stealing the information of LHA's clients to make nearly a million dollars for himself was in any way appropriately compensatory for LHA's purported failure to pay him "thousands of dollars in commissions."   Lucarelli Sub at. 1.   Lucarelli's misguided retaliatory motive does not diminish the seriousness of his criminal conduct.

9

Lucarelli also argues for leniency on the basis that his conduct was the product of drug

abuse resulting, in part, from a chronic medical condition.   *See* Lucarelli Sub. at 3.   The

Government does not make light of the medical challenges that Lucarelli has faced over the years,

nor does it deny that drug addiction poses vexing challenges for those who are burdened by it.

However, neither drug addiction, nor Lucarelli's medical condition, can justify his criminal

conduct.   Indeed, Lucarelli's conduct – involving computer accesses of draft press releases, close

tracking of the market to ensure trading in the proper windows before and after public

announcements, and the opening of new brokerage accounts when his other accounts were

suspended – suggest the workings of a sophisticated operator of a complex scheme, not the

behavior of a drug-addled mind unaware of what it was doing.   Further, unlike many other

defendants sentenced in this courthouse every day, Lucarelli had the substantial advantages of an

advanced education and financially rewarding employment.   As noted above, Lucarelli earned a

substantial salary both while working at LHA and, as reflected in the PSR, during his previous

employment from 2005 through 2011.   *See* PSR ¶ 93.   In spite of those advantages, he committed

serious crimes designed – whatever the psychological motivations behind them – to turn secrets of

his employer and his employer's clients into gains for himself.   This merits substantial

punishment, notwithstanding the burdens that Lucarelli has faced in his life.

Finally, Lucarelli argues that he has been sufficiently punished because he has forfeited the

proceeds of his illegal conduct.[4]   Indeed, Lucarelli argues that the "just punishment" for his crime

"would be primarily financial" and that he "has already relinquished all of his financial assets to

the government, hundreds of thousands of dollars, and therefore has already received a significant

---

[4] The Court has already entered a preliminary order of forfeiture, consented to by the defendant, in
the amount of $955,521.62, which represents the defendant's illicit gains resulting from his
criminal conduct.   This order will become final upon sentencing.

punishment correlating to the nature and degree of his crime." Lucarelli Sub. at 5.   It is indeed

true that the Government has seized and liquidated a brokerage account owned by Lucarelli, in

partial satisfaction of his ultimate forfeiture obligations.   The Government obtained proceeds of

approximately $675,000 through this seizure and liquidation, substantially less than the full loss

amount attributable to Lucarelli's illegal conduct.   It is just and appropriate that Lucarelli forfeit

the ill-gotten gains of his illicit conduct.   But forfeiture alone is not a substitute for incarceration

and forfeiture alone is an inadequate punishment, and an inadequate deterrent, for insider trading.

If the only consequence of insider trading is relinquishment of ill-gotten gains, then insider trading

can yield substantial upside for those whose crimes are not detected, with limited downside (mere

restoration to the *status quo ante* through relinquishment of gains) for those such as Lucarelli who

are caught.   Such a punishment regime will do little to deter potential securities fraudsters from

attempting to realize the significant potential upside of undetected insider trading.

Because insider trading schemes are both highly lucrative and difficult to detect,

significant punishment is necessary to deter others from similar conduct.   *See United States* v.

*Heffernan*, 43 F.3d 1144, 1149 (7th Cir. 1994) (Posner, J.) ("Considerations of (general)

deterrence argue for punishing more heavily those offenses that either are lucrative or are difficult

to detect and punish, since both attributes go to increase the expedited benefits of a crime and

hence the punishment required to deter it.").   Should Lucarelli receive a light sentence, financial

professionals may be emboldened to engage in similar crimes, knowing that such schemes are

difficult to detect and that even if they are caught, they will not face significant jail time.   In

addition, such a sentence would further shake the public's confidence in the integrity of the public

markets by sending the message to the investing public that even when financial professionals are

caught engaging in multiple and long-running acts of insider trading, they are only lightly

11

punished.   To deter criminal conduct by professionals like Lucarelli, effectuate the purpose of the

securities fraud laws, and send an appropriate message that this type of fraud will not be tolerated,

a sentence within the Sentencing Guidelines range is warranted.   In sum, forfeiture alone is an

inadequate punishment for Lucarelli's criminal conduct.

### CONCLUSION

For the foregoing reasons, the Government respectfully submits that Lucarelli has

committed a serious offense, the appropriate punishment for which is adequately reflected in the

applicable Guidelines range.   Accordingly, the Government requests that the Court impose a

sentence within the applicable Guidelines range of 37 to 46 months' imprisonment, as such a

sentence would be sufficient but not greater than necessary to serve the legitimate purposes of

sentencing.


Respectfully submitted,

PREET BHARARA
United States Attorney


By:   _/s/ Brian R. Blais_____
Brian R. Blais/Damian Williams
Assistant United States Attorneys
Tel.:   (212) 637-2521/2298


Dated: December 31, 2014
          New York, New York